## HARVEY et al. v. MEADOWLAKE MILK PRODUCTS CO. et al.

### No. 3838.

Court of Civil Appeals of Texas. Texarkana.
March 27, 1930.

Westbrook & Hines and Webb & Webb, all of Sherman, for appellants.

Head, Dillard, Maxey-Freeman, McReynolds & Hay, Jesse F. Holt, and Elbert M. Barron, all of Sherman, for appellees.

HODGES, J.

In September, 1928, Carl Harvey, a minor, was injured on a public highway in a collision between a car driven by him and a truck driven by one E. B. Rather. This suit was later instituted by Golden Harvey, the father of Carl Harvey, for himself and as next friend for his son, against the Meadowlake Milk Products Company, to recover damages for the injuries sustained in that collision. The petition alleged negligence in various ways on the part of Rather, and further alleged that Rather was at the time an' agent and employee of the Meadowlake Milk Products Company. Rather was not made a party defendant in the suit. The Meadowlake Milk Products Company answered generally and specially, denying that Rather was its agent or employee, but that he was an independent contractor engaged in collecting and delivering milk to the Meadowlake Milk Products Company. It asked that Rather be made a party to the suit, and that, in the event a judgment was rendered in favor of the plaintiff, it have a similar judgment over against Rather. After hearing the evidence, the court instructed a verdict in favor of the Meadowlake Milk Products Company. In giving that instruction, the court evidently concluded as a matter of law that, notwithstanding the negligence of Rather in causing the collision and resulting injuries, the evidence was not sufficient to support a finding that Rather was at the time a servant or agent of the Meadowlake Milk Products Company. The only question presented in this appeal is, Should that issue have been submitted to the jury?

The record shows that the Meadowlake Milk Products Company is a private corpo-

ration with its place of business at Sherman, Tex., and is engaged in buying milk from rural producers and selling milk products. It had a written contract with Rather by which the latter was engaged to collect milk daily from producers on certain routes in the vicinity of Sherman. The contract is as follows:

"This contract made and entered into the 31st day of July, 1928, by and between the Meadowlake Milk Products Company of Sherman, Texas, hereinafter called the first party, and E. B. Rather of Sherman, hereinafter called the second party,

"Witnesseth: The second party, a carrier, agrees to solicit milk from every one on the route assigned the second party by the first party. The second party understands that the said second party is not an agent or employee of first party, nor does the said second party represent or act for the said first party in any way whatsoever. By this contract the second party, an independent contractor, acts merely as a carrier to transport milk for the first party's patrons to the first party's plant.

"The second party agrees to accept all milk conforming to the requirements of the first party and deliver it to the first party as promptly as possible. The second party also agrees to give this milk every possible care and attention in order that the milk may be delivered to the first party in as good condition as it was when received by the second party.

"The second party agrees not to solicit milk in any territory assigned by first party to another carrier.

"The second party agrees to be always fair, courteous and impartial in dealing with all patrons, prospective patrons and every one with whom the said second party comes in contact in carrying out the provisions of this contract.

"The second party agrees to furnish a truck satisfactory to the first party, to convey the milk from receiving points to the plant of the first party.

"The first party is granted the privilege of painting its name or any matter pertaining to its business, if the first party so desires, on the body of the truck being used by the second party in the performance of this contract.

"The second party agrees to return empty milk cans to patrons free of charge in as good condition as when received, reasonable wear and tear excepted.

"The second party agrees to solicit milk in the territory assigned to said second party by the first party at regular times each day, and if the said second party is prevented by sickness or any other reason from carrying out the first part of this clause of this contract, the said second party will have a reliable third person, the said third (person) having the trust and confidence of the first party, who will act as the agent of the said second party and will carry out the terms and provisions of this contract for the said second party.

"In consideration of the agreement herein contained the first party agrees to pay the second party a flat rate of twenty (20) cents for each one hundred pounds of milk received in good condition at the said first party's plant in Sherman, Texas, from said second party. The above mentioned freight rate of twenty (20) cents for each one hundred pounds of milk received being deducted by the said party of the first part from the amount paid the patron who originally consigned the milk to the said first party by way of the truck operated by the said second party.

"This contract may be terminated upon thirty (30) days notice being given to the other party in writing by either of the parties hereto."

Rather testified, in substance, that he had been engaged in the business of trucking for about two years. During the preceding September he was hauling milk and such other freight as he could "pick up." He was collecting milk at different places and delivering it to the Meadowlake Milk Products Company. He carried other freight besides milk. He had a route which he traveled, and, after collecting and delivering the milk, he would go around and pick up all the freight he could find and take it out with him when he started again on his route. He said:

"I would get all the freight I could in Sherman and take it out with me, such as merchandise. I would go to the grocery houses and get anything I could. I would usually have something to take out. In bringing in freight from the farmers to the Meadowlake people I would carry other freight as I came in. I would carry freight both ways, going out and coming in. I hauled it all in the same truck. I did not have but one truck at that time; I have had two since that time; and I would carry freight to Dallas, McKinney, or anywhere else. * * * The Meadowlake Milk Products Company did not get any part of that revenue. The farmers paid me for hauling the milk to the Meadowlake Milk Products Company. I know the method by which I was paid. I know how it was paid. I know from whom the money came that I was paid. I know that of my own knowledge. The Meadowlake Milk Products Company would collect from the farmers and pay me for hauling the milk. They would deduct my money from the amount they paid for the milk. I know that to be a fact. The Mead-

owlake Milk Products Company had no control over my trucks. They did not buy or own the trucks. They did not do any repairs on the trucks. I paid for the gasoline to operate the trucks and paid for the repairs. * * * Said company did not receive any part of the earnings of my trucks. The Meadowlake people were interested in the results of my work only. They wanted the results, and that was all they were interested in. The farmers owned the cans I hauled. That is, the patrons of the Meadowlake Milk Products Company. * * * I think I had twenty or twenty-five customers on my route at that time. Some of them had five-gallon cans. They did not have containers smaller than five gallons. * * * I was paid 20c per hundred pounds for the hauling of that milk by the Meadowlake people. They collected the money and paid me. I presume they paid the farmers for the milk. I was to furnish the truck. I did furnish the truck. I did not give them the right to paint on that truck 'Meadowlake' Milk Products.' They did not say anything to me about that. I did not see it in the contract I signed. I do not remember whether they told me to be courteous, fair and impartial in my dealings with their patrons. I don't know that I agreed to that. * * * I drove the truck myself. As well as I remember, at that time I was making the route twice a day. That took practically the whole day."

A. G. Hopkins, secretary and treasurer of the Meadowlake Milk Products Company, testified as follows:

"Mr. J. F. Holt was the man who did the field work with the patrons; he was called the field representative of the Meadowlake Milk Products Company. * * * He had authority to sign a contract with Mr. Rather. He had authority to discharge Mr. Rather if his services were unsatisfactory to the patrons and to us. We were anxious to get the milk, and of course the driver is anxious to get the patrons. * * * We did not pay the truck drivers every time the milk was delivered; we paid them twice a month. * * * The Meadowlake issued checks to the truck drivers—Meadowlake checks; and they also paid the patrons by Meadowlake checks. * * * The clause in the contract which says that Rather is to furnish a truck satisfactory to the defendant company means that if the truck was in such shape that it would not bring in the milk in time, we would not want any one to use such a truck. * * * The company had supervision of the truck only to this extent: Mr. Rather could not give service to the patrons, and the company would not permit him to use a truck that was not satisfactory to the patrons."

There was no other testimony adduced which tended to show the relations between Rather and the Meadowlake Milk Products Company to be different from those created by the written contract previously quoted.

■ Whether or not Rather was an agent of the company, or an independent contractor, must be determined by the terms of the written contract, since that is the only agreement under which he performed the services. We are of the opinion that the following cases warrant the conclusion of the court that the evidence was insufficient to support a finding that Rather was at the time of the injury an agent or servant of the Meadowlake Milk Products Company. National Cash Register Co. v. Rider, 24 S.W.(2d) 28, by Commission of Appeals; Southern Surety Co. v. Shoemake (Tex. Civ. App.) 16 S. W.(2d) 950; Cunningham v. Ry. Co., 51 Tex. 510, 32 Am. Rep. 632. In the last case cited the Supreme Court used this language:

"In the first relation, that of master and servant, the master has the right to direct the conduct of the servant and the mode and manner of doing the work, and hence his corresponding liability for an improper execution of the same. * * * 'He is deemed the master who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of the work, but in all its details.'"

That seems to be a fair statement of the rule recognized in this state in determining whether or not the relations of the parties are those of master and servant. In this case the contract with Rather stipulated that he was to furnish his own truck and to pay the expenses of its operation and repair. He received his compensation by the quantity of milk he delivered. If he delivered no milk, he received no pay. It is true he was to work every day and to observe certain hours. That requirement was doubtless to insure the delivery of the milk while fresh and in proper condition. There was some testimony that he might be subject to discharge by one of the company's officers. But that evidence is entirely consistent with the conclusion that this officer had the right to terminate the contract according to its terms when the service rendered by Rather was unsatisfactory. It was expressly stated in the contract that Rather was in no sense an agent or servant of the company. Hence his authority and his duties as well were regulated by the terms of that contract. The company had no right to demand that he do anything in its interest not provided for or implied in the writing. Nothing Rather was to do was left to the will or direction of the company.

Counsel for appellant call attention to the provision of the contract which required Rather to be fair, courteous, and impartial in dealing with the company's patrons. It

is contended that this stipulation as to details tends to show that Rather was a servant and not an independent contractor. We are of the opinion that this stipulation in the written contract rather strengthens the conclusion that Rather occupied the status of an independent contractor. It shows that his obligation to perform those details arose, not from the will of the Meadowlake Milk Products Company, but from an express contractual stipulation. If he were merely the servant or agent of that company, that duty might have been imposed by the will or direction of his employer.

The judgment is affirmed.